Case number 24-1270 et al. City Utilities of Springfield, Missouri et al. Petitioners v. Federal Energy Regulatory Commission. Ms. Taylor for the petitioners, Ms. Banta for the respondent, Ms. Murphy for the interveners. Good morning, council. Good morning. Ms. Taylor, please proceed when you're ready. Morning, your honors. Charlotte Taylor from Jones Day for petitioners. Southwest Power Pole's Highway Byway methodology was adopted to respond to significant challenges in the previous regional transmission planning process where facility by facility allocation had led to conflict and stymie deficiency. Highway Byway establishes a bright line system for allocating costs ex ante. The system does not claim to achieve perfect matching of costs and benefits with respect to every single facility, but it is empirically supported and aims to achieve rough justice over time. Ms. Taylor, could you get a little closer to the microphone? I apologize. Certainly. Okay. Let me should I raise it as well? Why don't you? I'm having a hard time hearing you. Okay. Please let me know if it's okay. Thank you. Crucially, Highway Byway contains a safety valve, the RCAR process to guard against cost benefit imbalances and unfairness. FERC has now opted to depart from that carefully crafted methodology on a one-off basis for a handful of facilities. FERC admits that this type of midstream reallocation of costs for pre-existing facilities is essentially unprecedented. One would therefore expect FERC to carefully explain why it is appropriate to do an about face and reallocate the costs for just these 4 facilities. But its explanation for discarding Highway Byway falls woefully short in at least 2 respects. 1st, FERC failed to address in any meaningful way the repeated finding in the RCAR process that the Sunflower Zone is a net beneficiary under the Highway Byway methodology. That is at least relevant to the question whether costs need to be reallocated for 4 facilities because of a supposed cost benefit problem. Yet FERC dismissed the RCAR process as procedurally irrelevant, which is inadequate reasoning. 2nd, FERC failed to adequately explain its departure from Order 1000's strong policy favoring ex-ante decision making and cost allocation. All it had to say was that Order 1000 does not prohibit other approaches, but that is unresponsive to the question whether it is appropriate here to change the allocation of costs midstream. In any case, even if you accept FERC's decision to toss its Highway Byway methodology out the window for these individual facilities, at that point it had to at least attempt to confirm that those who will pay for the facilities actually benefit from them. That is a settled requirement of the cost causation principle. But as Commissioners Christie and See both stated, and as neither FERC nor intervenors contest, none of the three capacity, flow, and benefit criteria shed any light on the distribution of benefits from these facilities to different parts of the region. FERC's decision to nevertheless allocate the facilities' costs region-wide runs headlong into the holding of the Illinois Commerce Commission and was arbitrary and capricious. FERC attempts to hide behind deference to its expert judgment on technical issues, focusing on the capacity, flow, and benefit criteria. But even on FERC's account, all these criteria show is that some electricity flowing over these four facilities has been leaving the Sunflower Zone. Of course, some electricity flowing over these four facilities leaves the zone. That is why costs for these facilities are already allocated one-third on a regional basis. But the question is whether that flow of electricity is so far out of balance that a departure from Highway Byway is justified, and no such showing has been made. So, on the first issue you started with, which I think is the RCAR issue, it's at least conceptually the case that that measurement covers a broader range than a particular facility, right? Correct. The RCAR methodology is, by design, not attempting to measure facility-by-facility because when it's the safety valve for a system that was adopted in order to move away from the burdens of facility-by-facility allocations. Right, so it could be the case that even if RCAR points in one direction, you could have a different result with respect to individual facilities. It could be, but again, I think the Commission would have to engage with the RCAR evidence and explain in a reasoned fashion why, where RCAR is indicating that the Sunflower Zone is a net beneficiary under the Highway Byway methodology as a whole, it's still appropriate to allocate these four facilities regionally. So, can you explain what exactly the RCAR methodology is measuring? I can give it a try. So, the RCAR methodology, and to go back to 2010, everybody understood when Highway Byway was adopted that it was sort of, you know, going to be, because it was bright line rules, it was going to be sort of a rough justice system. It was adopted right on the heels, in fact, of the Illinois Commerce Commission decision, and everybody was also aware that there needed to be an effort to make sure that this regional allocation of costs was going to be fair. And so, RCAR was the solution to that. RCAR, it's a safety valve. I mean, there was another solution. I'll be more precise, I guess. This, when you look at RCAR 3, it labels everybody a net beneficiary. Correct. And in fact, it labels Sunflower a lower than average net beneficiary. And this argument would make a lot more sense to me if it were somehow a sort of mathematically precise quantification of costs and benefits where Sunflower is a winner and other zones are already losers. And you're now reaching in to shift more costs into the loser zones. That would seem very unfair, would require more explanation. But although I don't fully understand what RCAR is measuring, it's certainly not doing that, right? You can't have a system where everyone is a net beneficiary if it's measuring sort of who's winning under the Highway Byway system. So, everybody is a net beneficiary. I have a few responses to that. One, it hasn't always been the case that every zone is a net beneficiary. So, in RCAR 1, which is on SPP's website, there were five zones that were indicated as below the 0.8 threshold. But the idea that what the sort of recommendations at that point were, well, let's develop more facilities on an expedited basis in the zones that are not benefiting. Because the point is to make sure that every zone is getting benefits from the regional transmission system in a way that is at least roughly commensurate with what it's paying. So, it is possible that everybody can be a net beneficiary because the regional transmission facilities could be benefiting everyone. And the costs could be allocated fairly such that they are each paying in proportion to their benefits. Now, some are coming out ahead in RCAR 3 and some are coming out a little bit less ahead, I would say, not behind. I would note that two of the petitioners have lower RCAR 3 values than Sunflower, OG&E, and AEP, and are not protesting overall. And I think to the extent that your question is getting at, I think, you know, is this just an apples and oranges comparison to look at the RCAR results that seem to be measuring something quite different than this facility-by-facility allocation? I think that's partly the point because if you go back to before Order 890 and then before Order 1000, there wasn't this efficient regional transmission planning process where ex-ante costs were allocated. And in the SPP in particular, there was much more – the previous methodology was trying to assign, you know, zonal – one-third went to the region and then two-thirds went to different zones on the basis of this flow measurement called the megawatt-mile metric. And I think that really was trying to measure how much electricity is flowing over a particular facility and where is it going, and so, therefore, who should pay? And there was a deliberate decision to move away from that. Now, nobody contests that highway-by-way is, you know, going to be a rough yardstick. And I think in every zone, there are going to be some facilities where you could do a measurement such as the one that Sunflower and SPP have advanced here looking at these three criteria and show, well, these facilities actually appear to be exporting more electricity than is going to the zone. But there might be other facilities where there is a greater local benefit than the allocation, you know, indicates under – you know, would reflect under highway-by-way. And the assumption is that in the aggregate, everybody will win some and lose some, but that the safety valve of the ER car will make sure that if there's real imbalance and things get out of whack, then there is a way to try to correct that imbalance. And so what Sunflower has effectively said is, well, we – these four facilities are our least favorite facilities in our zone because we feel like we're losing on these four. We want to reallocate those. But if everybody did that, then the highway-by-way system would come apart, right? If you buy an index fund at the end of the year, it's giving you a nice return on investment. You don't go back to the company that sold it to you and say, well, that's all well and good, but I'd like to take the four least well-performing stocks out of the index fund so that I can do even better. And again, Order 1000 indicates that the right path – or not just – you know, it expresses FERC's firm policy that cost should be allocated ex ante in order to foster a transparent and collaborative regional planning process. That's been working. But if everybody can just then come back and say, okay, that's all well and good, but we would really like to take, again, our least favorite facilities and just have a little exception here, then that's going to undo the consensus and the predictability and transparency that highway-by-way has instituted consistent with Order 1000. I would also just – well, I can reserve the remainder of my time for rebuttal, I guess, if you – Do my colleagues have any additional questions?  I'm going to reserve my time for rebuttal. Thank you. Good morning, Carol Banta for the commission. I'd like to begin by just refocusing on who filed what because it's important. This is not a case where Sunflower came to the commission asking to reallocate its facilities. The Regional Transmission Organization, Southwest Power Pool, its tariff, it came to the commission, it went through whatever internal processes it has to decide to make that filing and it did have an internal process that it described. Going through its cost allocation working group and its regional states committee, which as a couple of the commissioners noted had voted by a super majority to bring this filing. It comes to the commission with a federal power act section 205 filing to change its own rate. And this court's very familiar with section 205 and what that means. That the commission did not reach out on its own or on a third party complaint to change a rate because it was unjust and unreasonable. It was brought a section 205 filing, which Southwest Power Pool proposed its own rate change and supported its filing with three detailed reports containing engineering analyses. And the commission had a statutory obligation to accept that proposal if it found it was just and reasonable and sufficiently supported. And it did. And it's just careful, it's important to focus on the fact that the Regional Transmission Organization for its own reasons and through its own internal process chose to make a filing to change its own rate and put the commission in what this court has several times described as an essentially passive and reactive role to assess the filing that's brought to it. I feel like that was pretty critical to the concurring commissioner of federations because they sent a pretty strong signal that but for the dynamic that you lay out, they might well have reached a different conclusion about it. That's right. I mean, and again, I mean, that was a commissioner concurring in the result. Of course, the commission by majority had voted on the merits that are laid out in the orders. But in the first order, one commissioner concurred in the result, heavily influenced by the fact that eight of the 12, that the 12 states that are in or in some part in Southwest PowerPool, each of their retail regulatory commissions is represented on the regional states committee, and it voted eight to four to bring this. And so in first order, one of the commissioners found that very persuasive. And in the second, in the rehearing order, two commissioners found that very persuasive. So it is a fact. But for our purposes, because the commission as a majority did not rely on that fact. It's just a background fact to explain that Southwest PowerPool doesn't just take something that Sunflower handed to it, rubber stamp it, and ship it off to the commission. It went through an extensive process. The reason there are three analyses here is because the commission, let me get the order right, in the brief window of time when the commission had allowed Southwest PowerPool potentially to make this decision itself internally, Sunflower submitted an application with its supporting evidence. And Southwest PowerPool began its process where its internal staff looked at that, ran their own analysis, and found essentially the same results. And then in 2024, after the commission had decided that Southwest PowerPool can't make these decisions by itself, that's why we were all here last year, Southwest PowerPool updated the analysis. So there's a third analysis. So all of these are in the 2024 filing. It has their updated analysis and the original Sunflower analysis. So it has analyses from 2022, 23, and 24 that it submitted to the commission in support of its Section 205 filing. I agree this is a background fact, but do you know why? Is there an explanation somewhere of why the state committee supported this? We could find the long explanation from the four who dissented, but not the, do you know why they supported it? All I have seen, and I believe if it's not a record, we may have given a site for it in our brief, is just notes from the meeting that say they held the vote and here's how they voted, at least which eight did and which four didn't. But as far as the reason, I think one thing we could say is that once Sunflower initiated its process within SPP, SPP staff did the report, which is attached to this filing. It begins at JA-136, and the internal staff recommended it. So presumably the state's committee was to some extent persuaded either by the staff recommendation or by the analysis that the staff put forward in support of its recommendation, but it was recommended internally. So Ms. Taylor and at least one of the commissioners also emphasized this concern about if you start doing this for individual facilities, eventually you'll sort of unravel or undermine the predictability of highway byway. And what is the commission's response to that concern? Well, I think it goes back to, I mean, Southwest has no interest in undoing its own process. So what does Southwest choose to bring to the commission in the first place? And Southwest went through what appears to be a rigorous process internally before it made that determination. It had these criteria, which it did initially develop for its own internal use, and then it made its case to the commission using those criteria. And those criteria had a logic to them that Southwest Power Pool explained. The capacity criterion, I think as Southwest Power Pool designed it, was intended to be a narrowing. You don't even meet the capacity. I believe they said, and I'm sorry, I don't know if I have the page, but the only three of the 18 zones could even meet that criterion, and that's before you get to the flow and then the benefit. So it had some internal limiting principles for what it was going to choose to bring to the commission. Again, that's internal, and the commission hasn't spoken to whether SPP is doing it correctly internally. The time it weighed in on the internal process was when Southwest was going to make this decision itself through the board, and the commission rejected that. But as far as what steps it went through or what any transmission organization goes through before they ultimately bring a Section 205 filing to the commission, that's more an internal matter and conflicts between the various stakeholders and the members within that organization. But when Southwest Power Pool brings its Section 205 filing to the commission, the that brings a rate filing to change its rates. The commission doesn't really look into how you decided, you know, if it's an individual utility, you know, whether they went through their board of directors or how they made that decision. Okay. And on the RCAR argument, what's your, do you have a specific response to that? Well, it's the same argument, in addition to what both of your honors, I think we're about what the RCAR does and doesn't prove. But from the commission's perspective, that's internal. The commission, the RCAR process neither requires Southwest Power Pool to make some particular filing at the end of or as a result of that process, nor does it limit Southwest Power Pool's right to make a 205 filing. So it's an internal process that's useful for Southwest's own reasons, but it doesn't really speak to whether Southwest had the right or the reason to bring this filing to the commission. And once it brings a Section 205 filing to the commission, again, the commission treats that the way it has to treat a Section 205 filing. And because the RCAR is a more general zonal thing, it doesn't really speak to the issue of these four facilities that Southwest brought to the commission. So it just doesn't have much to say to this case, even if it means a great deal to the parties within Southwest Power Pool who are tussling over these issues. So I did address that it couldn't theoretically be every zone because the criteria Southwest has imposed on itself for when it would do this. But I want to talk a little bit about the specific four facilities. And as we noted in our brief, I think we even noted it in the case last year, Southwest represented to the commission that it doesn't anticipate any more of these filings. It didn't necessarily explain the reason. It probably has to do with the criteria. That's at J38 in its filing to the commission. It said, we don't expect any more of these. So there's something about that Southwest has found about the sunflower zone and about these four facilities in particular. So I want to talk about for a second about the flow criterion and what they proved under the flow criterion. Because I do think it's important to note that it's not just that these facilities are incidentally, incidentally, I think the petitioners at some point used the word incidentally touched by this flow. And so I want to point to a couple. First of all, if we look at J24, which is in the filing, and I would also give you citations to J31 and JA144. There are several places this appeared because there are redundancies among these three analyses. The facilities at issue, first of all, the way the flow test works, it's something that Southwest is familiar with. The commission is familiar with it. It's a form of, I think, computer modeling, where you take any given facility and you model how the whole system interacts with that facility. And you add another megawatt to some generation resource somewhere and you see sort of where it flows through the system. There are experts in the commission who understand this. They try to explain it to me. That's about as far as I can get with it. I think it's computer modeling, but it is meaningful. It does tell you what a facility is doing when the system is running, for lack of a better word. But if we look at J24 and the four facilities, or it looks like just kind of a set of facilities that are grouped together here, the percentages, the result of the test, the criterion Southwest had set for itself was just being above 70 percent, but the numbers we're getting are 73 percent, 83 percent. One of the facilities, which is a transformer that moves between the extra high voltage, 345 kilovolt, and the lower high voltage, 115, 95.8 percent of its use is for the unaffiliated generation that is flowing out of this zone to other zones. So, basically, this is telling you that these byway facilities are operating more like on ramps to the highway facilities. Because these numbers above 70 percent are basically what the highway-byway split, although it was decided on voltage, the proof Southwest put in for that was that the highway facilities were running at 65 to 85 percent, you know, generally averaging out to about 70 percent, or 78 percent is the number. And the zonal, the byway facilities were, on average, operating about 28 percent. So, what this flow criterion is showing with these facilities, they're doing 73, 83, 95, they're acting like highway facilities, because they're working with the highway facilities to move this excess generation elsewhere in the zone. I don't know that I had anything else from the judges, from Your Honors' earlier questions. Thank you. Okay. Thank you, Ms. Pantla. We have an intervener now, Ms. Murphy. Good morning, Your Honors, and may it please the Court, Aaron Murphy, on behalf of the interveners in support of the Commission. I just want to go over kind of three quick points. The first is, you know, the basic premise of the petitioner's argument here is that we're trying to jettison the highway-byway system for purposes of these facilities, and that's really not what's going on at all. I mean, all of this is premised on using the same basic framework of the highway-byway system, which is premised on the idea that if you're operating more like a highway, your costs should be allocated to the whole region. If you're operating more like the byway, it should be 67, 33. That whole framework is kept in place. All that's changed here is looking at a different criteria for establishing who's a highway. Normally, the default rule is you can figure that out by looking at voltage, but here, the, you know, Sunflower brought to SPP and SPP brought to the Commission evidence that these criteria showed that for these particular facilities, they actually are operating more like highways. And at that point, all that happened here is the Commission said, okay, you can treat them like highways. Allocate their costs the same way the highway-byway system always has for a highway instead of a byway. So this really isn't at all kind of undoing the way that framework works. It's just saying while voltage is usually the right proxy, sometimes a different proxy is going to get you to a different result. And that goes to my second point, which is, you know, FERC didn't just say and SPP didn't just demonstrate that these facilities are providing some benefits to the region. What FERC concluded after looking at the evidence is that they are primarily, that's at 449 of the record, mainly 459 of the record, supporting the region, not just the zone. And that's based on some of the criteria you just heard the Commission talk about. That evidence, you know, you've got a region that is itself producing way more energy than that region needs, the generation that's the capacity criteria. Then you have these facilities operating three times, the flow on them is three times as high as on the average byway facility for that unaffiliated load that's not being used in the zone. And then you have that benefit criteria where the threshold idea under the criteria SPP had set up was that it should be at least a 50 percent greater benefit to the region than the zone. And for these facilities, it's 300, 400 percent greater for the region than for the zone itself. So we've got facilities here that aren't just, you know, doing a little bit more work for the zone. They are primarily, mainly serving the zone in exactly the way that the highway byway system is designed to be looking for. Do you have a system that's operating more as a highway? And so you've got, you're not jettisoning the framework. You've got the evidence to show that these facilities are different. And then the last thing I just want to say is a few words about the RCAR. So, you know, what that is designed to do is measure the costs that the particular zone is paying in as compared to the benefits that it's getting from the entire system. And what it does is it looks at that every six years for each zone. But it looks at it at the zone level. And there are many facilities within a zone. And so what it tells you is, you know, sure, the Sunflower Zone, as your Honor pointed out, like basically all the zones, is a net beneficiary. But that doesn't tell you there's dozens of facilities within the zone. And that doesn't mean you might not have some facilities where you're really having a cost causation problem. And as the commission explained in his orders, the RCAR process just isn't designed to look to that at all. It's not looking at the facility level. So it doesn't provide data about the facility level. It's at the zone level. It's every six years. It's a safety valve. It's a safety valve. FERC never said and SVP never said in its tariff that it's the only way that you could ever go about looking to see if there might be some issues with how Highway Byway is working. And I don't think it could have consistent with this court's precedent because this court said in the PSAG case that FERC can't essentially kind of confine the SVP or RTOs and ISOs generally in a way that means they can't come with a 205 petition and say we've got a cost causation problem here that needs to be addressed as to particular facilities notwithstanding our ex-ante, you know, cost allocation principles. Unless your honors have any questions, I'm happy to. Do you understand what goes into the benefits bucket of RCAR? Because here's one version of it that would have made sense to me is the benefit is we're going to try to quantify, and I know this would be very hard, how much energy your zone is getting and the cost is how much you're paying. But that doesn't seem like what they are measuring. So do you know what's going in the benefit bucket? I think it's a little bit more focused on kind of are your costs kind of going down by virtue of the benefits you're getting from being connected to the rest of the system. So, you know, if you think about it, like, if you're not connected, you got to do it all yourself. If you are connected, then you want to ask, are these facilities helping your you, you know, are you getting some savings out of being connected to the broader region? And that's why when if you think about, you know, this particular question, it's kind of the converse of, well, our facilities are really, you know, there's a lot of transmission happening in this zone that you wouldn't need if you weren't part of the broader interconnected SPP region where sunflowers generating a lot of energy, this wind energy that's being generated is not being used principally or even, you know, kind of close to predominantly in the sunflower region. The bulk of it is going elsewhere. So that's a benefit that's going out. And then you look at, you know, is the transmission cost kind of coming out fairly in terms of sunflower being stuck paying all the transmission costs to get that energy out that it's, you know, kind of look at both pieces, the benefits in terms of the energy you're generating and the benefits in terms of the system and who's doing the bulk of the transmission work. Thank you. Thank you, Council. Thank you. Ms. Taylor, we'll give you the time that you had left. Thank you very much. Just to pick up where Ms. Murphy left off with Judge Garcia's question, I do actually have some sample criteria that are the benefits that are measured in the RCAR process. That includes things like avoiding having to build further reliability projects, mitigation of transmission outage costs, benefits from meeting safety standards, and so on and so  forth. There's also things like meeting public policy goals, reduce costs from extreme events like winter storms and things like that. So there's a sort of they focus on overall regional benefits from the regional transmission system. And again, to speak sort of more broadly to the RCAR, there's, you know, we don't dispute that it is measuring something different than the particular, you know, extrazonal, you know, flows of over these four facilities. But our point is that if FERC is going to depart from the highway byway methodology, it needs to explain why the RCAR methodology, which shows a net benefit, is overcome by this, you know, the particular cost imbalance that is asserted with respect to these four facilities. And to put that in a larger, to go to the, I think that fits into the Section 205 arguments that have been made, which is that because this is a Section 205 filing, all this court should do is ask narrowly whether these four facilities, you know, whether this allocation would be just and reasonable. But that doesn't address the sort of background administrative law requirement that if you're changing your position, you demonstrate awareness that you're changing your position and that you, and sufficiently explain the reasons why. Just to give you a citation, there's in Advanced Energy United from a couple of years ago, 82F41095 at 1116 to 1117, that was a Section 205 proceeding where this court rejected a the commission was changing position without adequately accounting for what had it done before. I feel like one of the things FERC would say is we're not changing our position. Our position before was that we let them implement highway byway, and now we're letting them make an exception. But it's sort of, it's not our position, it's SPP's position. Well, so it is changing its position, certainly from the Order 1000 principle that ex ante cost allocation is beneficial. Nobody has come up with a single example in all the briefing of certainly of a Section 205 proceeding being used to allocate costs midstream. And we would say really for any, whether Section 205 or Section 206. But if, I do think that if Sunflower had come in and under Section 206 and carried the burden to say that this is unjust and unreasonable as applied to them with respect to these four facilities, then there would, you know, that might, you know, frame the issues in such a way that it would be appropriate. I mean, I don't want to commit that these would, that we would agree with that. But then I think that's the type of potential reallocation that was, for example, contemplated in the coalition of mesotransmission customers that under Section 206, if you really believe that there is an unjust and unreasonable result being reached, that you can then bring in as applied challenge. But what, you know, SPP is sort of arguing, just ignore the context. We're the, you know, we're the RTO. We're telling you, you know, we think this is just and reasonable. Don't look at what we've done in the past and don't, you know, and then FERC is saying don't look at what we've said in the past. Don't look at, you know, our approval of the highway byway methodology. We're just focused very narrowly. And we don't have, there's no precedent that we are aware of for doing that under Section 205. But even if there were, they would have to adequately explain their change in position. I see, if I have, if you, if I could, I would like to also just touch on this idea that because of the stakeholder process and the role of the regional state committee, there's somehow deference that is appropriate. So, you know, Section 205 requires the commission as a statutory matter to determine that the filed tariff is just and reasonable. We're not aware of any case that under which this court has approved the commission giving deference without independently exercising its judgment as to whether a particular cost tariff is just and reasonable. So, you know, we do think it's highly significant that two commissioners believe that this cost reallocation was problematic in large part because there was no, the three criteria do not identify the distribution of benefits. There's no showing that, you know, North Dakota is benefiting equally as Oklahoma from this particular, you know, transformer that's located in Kansas. And yet they, you know, the part of their reasoning that I would disagree with is that they went along with it anyway because of the regional state committee's vote. Because again, stakeholder process is all well and good, but there's a statutory non-delegable obligation that the commission has. And, you know, it could lead to real process problems if all the state committee has to do is to vote 11-1 to put all of the costs on, you know, Oklahoma, then, you know, there's no way that that could be a precedent that FERC would defer to. The court has no further questions. Thank you very much. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan; Henderson; Garcia